**FILED**

SEP - 6 2001

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
     DEPUTY CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----ooOoo----

BLUE MAGIC PRODUCTS, INC.,

    Plaintiff,

  v.

BLUE MAGIC, INC., AUTOCLEANER, LLC, MICHAEL MOSHONTZ, and BLUE MAGIC POLISH CORPORATION,

    Defendants.

NO. CIV. S-00-1155 WBS JFM

MEMORANDUM AND ORDER

----ooOoo----

    This trademark infringement action arises out of a dispute concerning the parties' use of the mark, "Blue Magic." Plaintiff Blue Magic Products, Inc. ("BMPI") alleges that defendants' predecessor abandoned the trademark registered as number 1,393,685 (the "'685 registration"), and seeks cancellation of that registration. Plaintiff moves for summary adjudication of this issue pursuant to Federal Rule of Civil Procedure 56.

I.   Factual and Procedural Background

    Plaintiff owns three incontestable "Blue Magic" trademark registrations for waterbed accessories (Reg. No.

198

1,156,014), a chemical fabric protector (Reg. No. 1,314,169), and a chemical protectant for vinyl, leather, plastic, and wood surfaces (Reg. No. 1,361,253).

Defendants' predecessor, the Blue Magic Corporation ("BMC"), was established in 1972, and sold automobile polishing and cleaning preparations. On June 18, 1982, BMC filed an application with the U.S. Patent and Trademark Office ("PTO") seeking registration of the trademark "Blue Magic," which the PTO issued to BMC on May 20, 1986 (Reg. No. 1,393,685)("the '685 registration").

On December 24, 1987, Ron Hutto and Larry Horn entered into an agreement ("the Agreement") with Christine Kay, the sole shareholder of BMC, "to receive the exclusive right and license to manufacture and sell on a world wide bases [sic] Blue Magic Metal Polish Cream for a term of 99 years." (Pl.'s Ex.3 ¶ 1, Attached to Gibson Decl.). Pursuant to the Agreement, Hutto and Horn received the "right to use the name and trademark of Blue Magic," and agreed to make annual "royalty" payments for a term of twenty years. The Agreement also provided that Hutto and Horn "shall assume ... [a]ll assets" of BMC. Id. On January 12, 1988, Hutto and Horn established defendant Blue Magic Polish Corporation ("BMPC").

Defendants argue that under the Agreement, Kay assigned the "Blue Magic" mark, including the '685 registration, to Hutto and Horn. In May 1992, Kay filed a document titled "Confirmatory Assignment" with the PTO, stating that "effective as of January 4, 1988, Blue Magic Polish Corporation did purchase and obtain the "BLUE MAGIC" mark and registration." (Pl.'s Ex.

2

4, Attached to Gibson Decl.).  The significance of the specified date, January 4, 1988, is not clear.  In January 1995, BMPC allegedly assigned the "Blue Magic" mark and the '685 registration to defendant Moshontz, president of defendant Blue Magic, Inc. ("BMI").  (See Def. BMPC's Ex. D, Attached to Love Decl.).

Plaintiff filed this action against defendants on May 25, 2000, alleging trademark infringement, false association, and false designation under the Lanham Act, 15 U.S.C. §§ 1114, 1125(a).  Defendants BMI and Moshontz filed a counterclaim against plaintiff for trademark infringement.  As an affirmative defense to the counterclaim, plaintiff argues that the Agreement constituted a "naked license" and thus, BMC abandoned the '685 registration.  As a result, plaintiff argues that defendants cannot claim the benefit of trademark rights established by Kay or BMC prior to the date of the Agreement.

Plaintiff's current motion seeks summary adjudication on the abandonment issue, dismissal of defendants' counterclaim for infringement, and a court order canceling the registration pursuant to section 1064 of the Lanham Act.

II.  Discussion

The court may grant partial summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c), 56(d).  The party adverse to a motion for partial summary judgment may not simply deny generally the

3

1  pleadings of the movant; the adverse party must designate
2  "specific facts showing that there is a genuine issue for trial."
3  Fed. R. Civ. P. 56(e); see Celotex Corp. v. Catrett, 477 U.S. 317
4  (1986). Simply put, "a summary judgment motion cannot be
5  defeated by relying solely on conclusory allegations unsupported
6  by factual data." Taylor v. List, 880 F.2d 1040, 1045 (9th Cir.
7  1989). The non-moving party must show more than a mere
8  "metaphysical doubt" as to the material facts. Matsushita Elec.
9  Indus. Co. v. Zenith Radio, 475 U.S. 574, 587 (1986).
10     A.  The Agreement
11         Under California law, "the fundamental goal of
12  contractual interpretation is to give effect to the mutual
13  intention of the parties."[1] Centigram Argentina, S.A. v.
14  Centigram Inc., 60 F. Supp. 2d 1003 (N.D. Cal. 1999). The plain
15  language of the contract governs its interpretation "if the
16  language is clear and explicit." WYDA Assoc. v. Merner, 42 Cal.
17  App. 4th 1702, 1709 (1996). However, even if a contract appears
18  clear on its face, California law requires the court "to engage
19  in preliminary consideration of extrinsic evidence to see whether
20  it creates an ambiguity." Stephens v. City of Vista, 994 F.2d
21  650 (9th Cir. 1993)("California has a permissive approach to the
22  admission of extrinsic evidence in contract interpretation.").
23         The first sentence of the Agreement states "This is an
24  offer for exclusive rights and license to manufacture and sell on
25  a world wide bases [sic] Blue Magic Metal Polish Cream." (Pl.'s
26  Ex. 3, Attached to Gibson Decl.). Paragraph 1 provides:

---

[1] The parties do not dispute that California law governs the court's interpretation of the Agreement.

4

```
 1        The Buyers are to receive the exclusive right and license to
          manufacture and sell on a worldwide bases [sic] Blue Magic
 2        Metal Polish Cream for a term of 99 years.  This is to
          include the following rights:
 3        a.   The right to manufacture Blue Magic Formula.
          b.   The right to use the name and trademark of Blue Magic.
 4        c.   The right to use all logos and other art work.
          d.   The right to sell the product to all past, current and
 5        future customers of the Blue Magic Corp.
```

 6   Id.  The Agreement defines "the Buyers" as Ron Hutto and Larry

 7   Horn.  Id.  Horn drafted the Agreement.  (Horn Depo. at 30:16-

 8   22).

 9         The plain language of the Agreement indicates that Horn

10   and Hutto received an exclusive license to use the trademark for

11   a term of ninety-nine years.  The language does not suggest an

12   assignment because it conveys less than Kay's entire interest in

13   the "Blue Magic" mark.  See Exxon Corp. v. Oxxford Clothes, Inc.,

14   109 F.3d 1070, 1076 (5th Cir. 1997)("A license to use a mark ...

15   is a transfer of limited rights, less than the whole interest

16   which might have been transferred." (quoting Acme Valve &

17   Fittings Co. v. Wayne, 386 F. Supp. 1162, 1165 (S.D. Tex. 1974)).

18   However, defendants offer extrinsic evidence seeking to show that

19   the parties intended to assign the mark under the Agreement.

20        B.   Extrinsic Evidence

21         The court will consider the extrinsic, or "parol

22   evidence" to determine whether the language is "reasonably

23   susceptible" to defendants' interpretation.  See Stephens, 994

24   F.2d at 657; WYDA, 42 Cal. App. 4th at 1710.  If the Agreement is

25   reasonably susceptible to defendants' interpretation, then the

26   evidence is admissible to interpret the meaning of the contract.

27   The admission of conflicting parol evidence presents an issue for

28   the trier-of-fact, and thus precludes summary judgment.  See

5

1  WYDA, 42 Cal. App. 4th at 1710.  On the other hand, if the
2  contract is not reasonably susceptible to defendants'
3  interpretation, or the parol evidence, if admitted, is not
4  conflicting, the interpretation of the contract remains an issue
5  of law.
6       First, defendants point to deposition testimony which
7  purportedly shows that Kay intended to sell the entire business,
8  and that Horn and Hutto intended to buy the trademark, believing
9  that the Agreement accomplished that purpose.  Examination of the
10 cited deposition testimony reveals only the subjective beliefs
11 and understandings of Horn and Hutto.  A party's subjective
12 intent is not relevant to the interpretation of a contract, which
13 must be based on the "objective manifestations of the parties'
14 intent."  Morey v. Vannucci, 64 Cal. App. 4th 904, 912 (1998).
15 Defendants have not pointed to any objective manifestations of
16 their subjective intent to buy the mark in the circumstances
17 surrounding the Agreement.  Moreover, the fact that Kay entered
18 into negotiations with other parties does not support an
19 interpretation that she intended to assign the "Blue Magic" mark
20 to Horn and Hutto in the Agreement.
21      Second, defendants argue that the license language and
22 reference to "royalty" payments in the Agreement were designed to
23 provide Kay with a security interest while allowing Horn and
24 Hutto to pay for the purchase in installments over time.[2]  Rather

---

[2]  Hutto stated in his deposition that Horn instructed him to use the term "royalty" in drafting the Agreement because it had "tax implications."  (Horn Depo. at 43-44).  According to plaintiff, royalties are deductible as a business expense.  See I.R.C. § 162(a).

6

1 than supporting defendants' position, the argument that Kay
2 retained a security interest under the Agreement tends more to
3 support plaintiff's position that the Agreement constitutes a
4 license because the parties intended to transfer something less
5 than Kay's entire interest in the trademark.

6 The case cited by defendants, Li'l' Red Barn, Inc. v.
7 Red Barn System, Inc., 322 F. Supp. 98 (N.D. Ind. 1970), does not
8 support a different interpretation regarding Kay's retention of a
9 security interest. In that case, the parties executed an
10 assignment, and then the assignee delivered an unrecorded re-
11 assignment back to the assignor as a security device. See id. at
12 106. Li'l' Red Barn did not involve a document purporting to
13 convey a license for the purpose of creating a security interest.
14 Therefore, Li'l' Red Barn is not persuasive on the facts of this
15 case.

16 Third, defendants argue that the parties' actions after
17 they executed the Agreement support an interpretation that Kay
18 assigned the trademark to Horn and Hutto. However, the fact that
19 Kay and BMC ceased using the mark is just as indicative of the
20 conveyance of an exclusive license, and does not necessarily
21 support defendants' interpretation of an assignment. The fact
22 that Horn and Hutto assumed control of BMC's warehouse,
23 facilities, and equipment is consistent with their purchase of
24 these assets under the Agreement, and the grant of an exclusive
25 license to use the trademark for a term of ninety-nine years.
26 Also, BMPC's alleged assignment of the mark to BMI in 1995 would
27 be consistent with Kay's transfer of all of her rights in the
28 mark to BMPC in 1992 under the "Confirmatory Assignment"

7

document.[3] See infra note 4. Thus, such evidence is not sufficiently compelling to overcome the explicit licensing language in the Agreement.

Fourth, defendants argue that two documents relating to the state civil action, Hutto v. Kay, Case No. 552881, support an interpretation that the Agreement assigned the mark: (1) the Memorandum of Settlement Terms and Conditions ("Memorandum of Settlement")(Def. BMI's Ex. 4, Attached to Baker Decl.), and (2) the findings of fact by the Superior Court Judge (Def. BMI's Ex. 5, Attached to Baker Decl.). The paragraph cited by defendants in the Memorandum of Settlement provides that as long as Horn and Hutto comply with the terms of the settlement, they "shall retain all control over the business, assets, goodwill, and all other property transferred under the contracts sued upon in the underlying complaint." (Def. BMI's Ex. 4, ¶ 6.7.4, Attached to Baker Decl.). This language neither mentions the trademark, nor contradicts the license language in the Agreement. Therefore, this evidence does not create any ambiguity that would make the Agreement reasonably susceptible to defendants' interpretation.

Further, the findings of fact in the underlying action are not probative on the issue of assignment versus license because the trademark was not the subject of dispute in Hutto v. Kay. (See Def. BMI's Ex. 5, at 6, Attached to Baker Decl.). The finding that Horn and Hutto deprived Kay of "all of her interest" and "assets" in BMC is consistent with Horn and Hutto's

---

[3] Plaintiff does not appear to dispute BMPC's ownership of the mark as of 1992. (See Pl.'s Statement of Undisputed Facts at ¶¶ 25-26)("BMC did not assign the Blue Magic name and mark until 1992.").

8

assumption of Kay's assets under the Agreement. The Superior Court Judge did not make any specific findings with respect to the "Blue Magic" mark in the underlying action. Thus, the court will not interpret the general reference to Kay's "assets" to create an ambiguity in the Agreement. See WYDA, 42 Cal. App. 4th at 1709 ("the intention of the parties is to be ascertained from the writing alone, if possible" (quoting Cal. Civil Code § 1639)).

Finally, defendants argue that the 1992 "Confirmatory Assignment" signed by Kay reveals that the parties intended to assign the mark under the Agreement.[4] However, there are many possible motivations for the execution of this document, signed four and one-half years after the Agreement. Therefore, this evidence is not probative of the parties' intent at the time they entered into the Agreement.

In sum, none of the parol evidence identified by defendants casts doubt on the plain meaning of the language in the Agreement. The parol evidence is not admissible to interpret the meaning of the contract because the Agreement is not

---

[4] The Confirmatory Assignment states:
the parties now wish to confirm in writing in a form suitable for recordation in the United States Patent and Trademark Office that, effective as of January 4, 1988, Blue Magic Polish Corporation did purchase and obtain the assignment of the "BLUE MAGIC" mark and registration. (Def. BMI's Ex. 6, Attached to Baker Decl.). The Confirmatory Assignment also provides:
said Blue Magic Corp. did on January 4, 1988, now hereby confirms that it did, and by these presents does hereby sell, assign, transfer, and set over unto said Blue Magic Polish Corporation, the entire, right, title, and interest in, to, and under said "BLUE MAGIC" trademark, including the above-identified ['685] registration thereof ....
(Def. BMI's Ex. 5, at 6, Attached to Baker Decl.).

reasonably susceptible to defendants' interpretation. The plain language is thus controlling, and the court finds that Horn and Hutto purchased an exclusive license to use the mark for a term of ninety-nine years. However, this finding does not end the inquiry regarding abandonment under section 1127.

### C. Abandonment Under Section 1127

Section 1127 of the Lanham Act provides:

> A mark shall be deemed 'abandoned' if either of the following occurs:
> (1) When its use has been discontinued with intent not to resume such use. ....
> (2) When any course of conduct of the owner ... causes the mark ... to lose its significance as a mark.

15 U.S.C. § 1127. Plaintiff argues first that Kay abandoned the mark under subsection (2) because the Agreement constitutes a "naked" license, causing the trademark to lose its significance as a mark. Plaintiff also argues under subsection (1) that Kay discontinued use of the Blue Magic mark with intent not to resume such use. The court considers each argument in turn.

#### 1. "Naked" License Theory

The statute itself makes no reference to the concept of a "naked license" in determining whether a trademark has been abandoned. However, courts have found abandonment under section 1127 when a trademark owner enters into a "naked" license, which is a "grant of permission to use [the trademark owner's] mark without attendant provisions to protect the quality of the goods or services provided under the licensed mark." Transgo, Inc. v. Ajac Transmission Parts Corp., 768 F.2d 1001, 1017 (9th Cir. 1985).

///

      Some courts have suggested that a "naked" license results in abandonment per se under section 1127(2) because such a license is "inherently deceptive." See <u>First Interstate Bancorp v. Stenquist</u>, 16 U.S.P.Q. 2d 1704, 1706 (N.D. Cal. 1990); <u>Westco Group, Inc. v. K.B. & Associates, Inc.</u>, 128 F. Supp. 2d 1082, 1087-88 (N.D. Ohio 2001)("naked licensing defeats the purpose of a trademark" as an indicator that "the goods and services sold thereunder are of a uniform nature and quality"). Other courts emphasize that a party asserting abandonment on the basis of uncontrolled licensing must show that the licensed mark has "lost its significance as a mark" as a result of the "naked" license. 15 U.S.C. § 1127(2); <u>Exxon Corp.</u>, 109 F.3d at 1079-80 (rejecting a presumption of abandonment); <u>Taco Cabana Intern., Inc. v. Two Pesos, Inc.</u>, 932 F.2d 1113, 1121 (5th Cir. 1991)("Where the particular circumstances of the licensing arrangement persuade us that the public will not be deceived, we need not elevate form over substance and require the same policing rigor appropriate to more formal licensing and franchising transactions."), <u>aff'd</u>, 505 U.S. 763 (1992); <u>United States Jaycees v. Philadelphia Jaycees</u>, 639 F.2d 134, 140 (3rd Cir. 1981)(declining to find abandonment on basis of "naked" license where licensee did not offer lower quality of service).

      The Ninth Circuit has not articulated a per se rule of abandonment on the basis of "naked" licensing. In <u>Siegel v. Chicken Delight, Inc.</u>, 448 F.2d 43 (9th Cir. 1971), the Ninth Circuit acknowledged that the licensor of a trademark "owes an affirmative duty to the public to assure that in the hands of his licensee the trade-mark continues to represent that which it

11

purports to represent." Id. at 51. The basis for the licensor's duty is the risk that inferior products will be presented to the public under the licensed mark. Id. Thus, the amount of control required by the licensor "varies with the circumstances," and is limited to that which is necessary to prevent public deception. Edwin K. Williams & Co. v. Edwin K. Williams, Etc., 542 F.2d 1053 (9th Cir. 1976); see Star-Kist Foods, Inc. v. P.J. Rhodes & Co., 769 F.2d 1393, 1396 (9th Cir. 1985)("The purpose of the rule is to protect the public from deception."); Transgo, 768 F.2d at 1018 (scope of a licensor's duty "must be commensurate with this limited goal" to "ensure the integrity of registered trademarks ...").

The failure to exercise control does not necessarily result in public deception. See Transgo, 768 F.2d at 1018 (finding that the licensor was entitled to rely on the licensee's own quality control where licensor was familiar with ability and integrity of licensee); Williams, 542 F.2d at 1059 (licensor's knowledge of licensee's competency, in conjunction with highly personalized nature of the licensed service, provided sufficient protection against public deception to preserve integrity of licensed name). Where the particular circumstances of the licensing arrangement persuade the court that the public will not be deceived, abandonment on the basis of a "naked" license is not justified under section 1127(2). See Taco Cabana, 932 F.2d at 1121.

The parties here do not dispute that "no one from BMC controlled or supervised BMPC's business operations" after the Agreement. (Def. BMPC's Statement of Undisputed Facts, filed

July 20, 2001, at ¶ 16). However, this fact alone does not compel a finding that the Blue Magic mark lost its significance as a mark under section 1127(2). The practical effect of the Agreement is indistinguishable from the sale of the entire business. Horn and Hutto purchased not only the exclusive right to use the mark, but also the exclusive right to manufacture Blue Magic Formula under the trademark for a term of ninety-nine years. (See Pl.'s Ex. 3, Attached to Gibson Decl.). Further, Horn and Hutto assumed all the assets of Blue Magic Corporation, including its offices, raw materials, finished goods, and manufacturing equipment. See id. Thus, the circumstances of the exclusive licensing arrangement did not pose the inherent risk presented by a situation in which a trademark is licensed separately from the business with which the mark is associated. Cf. 15 U.S.C. § 1060 (trademark is only assignable in conjunction with the goodwill of the business, i.e. that portion of the business with which the mark is associated); see Dawn Donut Co., Inc., v. Hart's Food Stores, Inc., 267 F.2d 358, 366-67 (2nd Cir. 1959)(explaining that "[p]rior to passage of the Lanham Act many courts took the position that the licensing of a trademark separately from the business in connection with which it had been used worked an abandonment" because it creates a danger that the products bearing the same trademark might be of diverse qualities).

       Plaintiff has not pointed to any evidence suggesting that the license resulted in public deception. Plaintiff argues that BMPC changed the formulation of Blue Magic metal polish after the Agreement. However, examination of Horn's deposition

13

testimony reveals that BMPC only changed the powder used in the formula because Kay's original powder supplier changed its manufacturing process and the formula "wasn't working right." (Horn Depo. at 74:1-2, 8-9); (see also Horn Depo. at 74:13-20)(stating that BMPC only experimented with other solvent systems). Thus, a reasonable jury could find that in changing the powder, BMPC was not only trying to maintain the product's uniformity and performance, but also to improve the quality of the polish by using a less abrasive powder. Therefore, triable issues remain concerning whether the Agreement caused the Blue Magic mark to lose its significance as a mark due to an alteration in the nature or quality of Blue Magic metal polish cream. The court will not elevate form over substance to conclude, as a matter of law, that the Agreement constituted abandonment under section 1127(2).

    2. <u>Discontinued Use With Intent Not to Resume Use</u>

    Plaintiff argues that Kay and BMC did not use the mark after the Agreement, and that BMPC's use of the mark pursuant to a "naked" license does not constitute "bona fide" use under section 1127(1). A trademark shall be deemed abandoned under section 1127 when "its use has been discontinued with intent not to resume such use." 15 U.S.C. § 1127(1). Non-use for three consecutive years constitutes prima facie evidence of abandonment. See id. "Use" of a mark under section 1127 means "use in commerce," defined as the "bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark." Id.; see 15 U.S.C. § 1127 (defining "use in commerce"). "Once created, a prima facie case of abandonment may

14

be rebutted by showing valid reasons for nonuse or lack of intent to abandon the mark." Abdul-Jabbar v. General Motors Corp., 85 F.3d 407 (9th Cir. 1996); see also Star-Kist Foods, 769 F.2d at 1396.

Section 1055 provides that the use of a mark by "related companies" inures to the benefit of the mark's registrant as long as the mark is "not used in such a manner as to deceive the public." It only addresses the "use" of a mark as between "related companies." The language does not expressly discuss the requirements for a valid "license," nor does it support a per se rule of abandonment based on "naked" licensing. See 15 U.S.C. § 1055; but see Reddy Communications, Inc. v. Environmental Action Foundation, 477 F. Supp. 936 (D.C.D.C. 1979)(finding that this section sanctions licensing arrangements only where licensees are related companies). The court finds nothing in the language of section 1055 that invalidates the exclusive license agreement employed in this case.

Further, as discussed above, triable issues remain concerning whether BMPC used the Blue Magic mark in such a manner as to deceive the public. The Agreement included the exclusive right to manufacture and sell Blue Magic Metal Polish Cream on a world-wide basis. Presumably, BMPC manufactured and sold the polish cream under the Blue Magic mark during the period of alleged non-use.[5] See 15 U.S.C. § 1127 (mark shall be deemed to be used in commerce when the mark is placed in any manner on

---

[5] Although the parties do not offer specific evidence on this point, they do not appear to dispute BMPC's continuous use of the mark pursuant to the exclusive license agreement.

15

1 | goods sold or transported in commerce).  The court cannot
2 | conclude as a matter of law that BMPC's use of the mark between
3 | 1987 and 1992 did not constitute "bona fide use in the ordinary
4 | course of trade" under the Lanham Act.  15 U.S.C. § 1127.  As a
5 | result, plaintiff has failed to establish a period of non-use
6 | creating a presumption of intentional abandonment under section
7 | 1127(1).
8 |   Even if plaintiff could establish non-use for three
9 | consecutive years under section 1127, the evidence does not
10 | support an inference of intentional abandonment.  Kay's agreement
11 | to license the mark is inconsistent with any alleged subjective
12 | intent to discontinue the mark.  See Sands, Taylor & Wood Co. v.
13 | Quaker Oats Co., 978 F.2d 947, 956 (7th Cir. 1992)(finding
14 | efforts to license a mark sufficient to rebut presumption of
15 | abandonment by non-use).
16 |   IT IS THEREFORE ORDERED that plaintiff's motion for
17 | summary adjudication be, and the same hereby is, DENIED.
18 | DATED: September 5, 2001

*/s/ William B. Shubb*
WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE

```
              United States District Court
                        for the
              Eastern District of California
                    September 6, 2001


              * * CERTIFICATE OF SERVICE * *


                                        2:00-cv-01155


    Blue Magic Products

         v.

    Blue Magic

    _____
```

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Eastern District of California.

That on  September 6, 2001, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office, or, pursuant to prior authorization by counsel, via facsimile.

```
       Chris Gibson                                 SH/WBS
       Boutin Dentino Gibson Di Giusto Hodell and West
       455 Capitol Mall
       Suite 300
       Sacramento, CA   95814-4406

       John P Murtaugh
       PRO HAC VICE
       Pearne and Gordon LLP
       526 Superior Avenue East
       Suite 1200
       Cleveland, OH   44114-1484

       Michael W Garvey
       PRO HAC VICE
       Pearne and Gordon LLP
       526 Superior Avenue East
       Suite 1200
       Cleveland, OH   44114-1484

       Peter Wethrell James
       Baker and Hostetler
       333 South Grand Avenue
       Suite 1800
       Los Angeles, CA   90017-1523
```

David James Miclean
Ropers Majeski Kohn Bentley
80 North First Street
San Jose, CA  95113

Elise R Vasquez
Ropers Majeski Kohn Bentley
80 North First Street
San Jose, CA  95113

Kenneth B Baker
PRO HAC VICE
Law Offices of Kenneth B Baker
Bond Court Building
1300 East Ninth Street
14th Floor
Cleveland, OH  44114-1503


Jack L. Wagner, Clerk

BY: _____
      Deputy Clerk