UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

BLUE MAGIC PRODUCTS, INC.,
(BOYD FLOTATION, INC., ALLEGED
SUCCESSOR OR ASSIGN),

      Plaintiff,

  v.

BLUE MAGIC, INC., et al., (THE
RECTORSEAL CORPORATION,
SUCCESSOR),

      Defendant.
_____

BOYD FLOTATION, INC.,

      Plaintiff

  v.

THE RECTORSEAL CORPORATION,

      Defendant.

NO. CIV. S-00-1155 WBS JFM
NO. CIV. S-04-2398 WBS JFM

MEMORANDUM AND ORDER
RE: MOTION TO ENFORCE
SETTLEMENT AGREEMENT & MOTION
FOR DECLARATORY RELIEF

----oo0oo----

        These two related cases both arise from the same set of facts and revolve around a 2002 settlement agreement ("the Settlement Agreement") between Blue Magic Products, Inc. ("BMPI") and Blue Magic, Inc. ("BMI") that is, by its terms, binding on

1

1 their "successors and assigns."  In case No. 00-1155, BMI's
2 successor, the Rectorseal Corporation ("Rectorseal"), seeks to
3 enforce the Settlement Agreement against Boyd Flotation, Inc.
4 ("Boyd Flotation"), who Rectorseal claims is a successor or
5 assign of BMPI.  In case No. 04-2398, Boyd Flotation seeks a
6 declaration that it is not bound by or otherwise subject to the
7 terms of the Settlement Agreement.  Because the resolution of
8 issues pending in each case is dispositive of the other, the
9 cases are resolved together.

I. Factual and Procedural Background[1]

At one time, BMPI owned three registered trademarks. First, BMPI registered the term "BLUE MAGIC" as a word mark for a waterbed conditioner on June 2, 1981.  This word mark was assigned United States Registration No. ("USRN") 1,156,014 ("'014 trademark").  (See Def.'s Req. for Judicial Notice ("DRJN"), Ex. A (United States Patent and Trademark Office Electronic Search System Printout)).[2]  Next, BMPI registered "BLUE MAGIC" as a word

---

[1] Unless otherwise stated, all citations to documents in this order refer to documents in case No. 00-1155.

[2] Rectorseal and Boyd Flotation have requested that the court take judicial notice of, among other things, certain registered trademarks, financial statement filings, court filings, and trademark Assignment Abstracts of Title.  (See DRJN).  Federal Rule of Evidence 201 permits the court to take judicial notice of facts that are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  Fed. R. Ev. 201(b).  The facts at issue meet this standard.  Taylor v. Charter Med. Corp., 162 F.3d 827, 828 (5th Cir. 1998)(court may take judicial notice of existence and content of court filings in another court); Morgan v. Morgan, 197 B.R. 892 (N.D. Cal. 1996)(taking judicial notice of a financing statement filed with California's Secretary of State); Cf. Metro Publ'g , Ltd. v. San Jose Mercury News, 987 F.2d 637 (9th Cir. 1993)(taking judicial notice of certified copies of trademark registrations).

2

1  mark for a chemical fabric protector on January 15, 1985.  This
2  word mark was assigned USRN 1,314,169 ("'169 trademark").  (See
3  DRJN, Ex. B (United States Patent and Trademark Office Electronic
4  Search System Printout)).  Thereafter, BMPI registered "BLUE
5  MAGIC" as a word mark for a chemical protector for vinyl,
6  leather, plastic and wood, on September 24, 1985.  This word mark
7  was assigned USRN 1,361,253 ("'253 trademark").  (See DRJN, Ex. C
8  (United States Patent and Trademark Office Electronic Search
9  System Printout)).
10         On May 20, 1986, BMI registered the same term, "BLUE
11  MAGIC," as a word mark for an automobile polishing cream, wheel
12  cleaner, automobile gloss and paint sealant.  This word mark was
13  assigned USRN 1,393,685 ("'685 trademark").  (See DRJN, Ex. D
14  (United States Patent and Trademark Office Electronic Search
15  System Printout)).
16         In 1995, BMPI and Wells Fargo Bank ("Wells Fargo")
17  entered into an agreement whereby BMPI granted Wells Fargo a
18  security interest in its general intangibles - including the
19  '014, '169, and '253 trademarks - to Wells Fargo in order to
20  secure certain BMPI obligations.  Afterwards, BMPI filed a
21  Uniform Commercial Code Financing Statement (No. 9522960240) with
22  the California Secretary of State reflecting the agreement.  (See
23  DRJN, Ex. E (Financing Statement No. 9522960240 filed on August
24  15, 1995).  On or about August 31, 1999, BMPI entered into an
25  agreement to continue to grant Wells Fargo a security interest
26  in, among other things, its general intangibles.  (See Boyd Decl.
27  Ex. B (Continuing Security Agreement)).  As part of that security
28  agreement, BMPI agreed "not to sell, hypothecate or otherwise

dispose of, nor permit the transfer by operation of law of . . . any of the interest therein, except sales of inventory to buyers in the ordinary course of Debtor's business." (Id. ¶ 6(b)(v)). Thereafter, BMPI and Wells Fargo filed a financing statement with the California Secretary of State indicating that BMPI was continuing to grant Wells Fargo this interest. (See DRJN, Ex. F (Financing Statement No. 00056C0106 filed on February 22, 2000)).

On or about May 25, 2000, BMPI filed a complaint in case No. 00-1155 against BMI; AutoCleaner, LLC; Michael Moshontz; and Blue Magic Polish corporation for trademark infringement. BMI made counterclaims of infringement against BMPI related to the '685 trademark. (See DRJN, Ex. J (BMI's Am. Answer, Countercl. and Cross-cl.). The litigation was resolved when BMPI entered into a Settlement Agreement with BMI and the other defendants in the suit in March of 2002. (See Pl.'s Mot. to Reopen, Ex. 1 (Settlement Agreement)). That agreement provided, in pertinent part:

- that BMPI and its successors not use the mark BLUE MAGIC in any form or combination on any product it markets or sells or may market or sell that relates to the automotive industry;

- that BMPI delete any reference to the mark BLUE MAGIC on its website in connection with products that it markets or sells to the automotive industry;

- that BMPI release and discharge BMI, its successors and assigns, from any and all claims, liabilities, actions, expenses and fees of every kind and nature;

- that BMPI had full authority to enter into the settlement through its President, Anthony J. Bova

- that the provisions shall be binding and inure to the benefit of each of the parties and their respective heirs, executors, administrators,

4

            agents, representatives, successors and assigns;

- that the parties' rights and obligations under the Settlement Agreement shall be interpreted, enforced and governed by and under the laws of the State of California.

(Id. ¶¶ 2.A, 2.C, 4, 11, 15, 17).

After the parties entered into the Settlement Agreement, the court dismissed case No. 00-1155 on or about May 14, 2002. (May 14, 2002 Order). The dismissal order provides that "the Court shall retain jurisdiction in this matter." (Id. at 2). Shortly before the dismissal order was issued, Wells Fargo filed a Uniform Commercial Code Financing Statement with the California Secretary of State on May 1, 2002 indicating that Wells Fargo had assigned its security interest in the collateral identified in Financing Statement No. 95522960240 to LINC Credit, LLC ("LINC"). (See DRJN, Ex. G (Financing Statement No. 02122C0012 filed on May 1, 2002)).

On June 11, 2003, BMPI filed a voluntary petition for Chapter 11 relief in the United States Bankruptcy Court for the Eastern District of California. (See Boyd Decl. Ex. A ¶¶ Y-Z). Thereafter, LINC Credit filed a motion for relief from stay to foreclose on its lien on BMPI's assets. (Id.). On or about August 3, 2003, the bankruptcy court granted that motion, permitting LINC to take possession and dispose of the BMPI assets on which LINC had a lien. (Id.). LINC foreclosed on its security interests in the assets of BMPI, whose bankruptcy trustee assigned the '014, '169, and '253 trademarks to LINC. (DRJN, Ex. N (Mem. In Supp. of Def.'s Mot. to Abstain, Transfer, Stay or Dismiss) ("Def.'s Mot. to Abstain")) at 3:3-7; See also

5

Baker Decl. Exs. 14-16(Trademark Assignment Abstracts of Title)).

On August 28, 2003, LINC entered into a Purchase Agreement with Boyd Flotation whereby LINC assigned its interest in, among other things, the '014, '169, and '253 trademarks to Boyd Flotation.[3] (See Boyd Decl., Ex. A (Purchase Agreement dated August 28, 2003); DRJN, Ex. N (Def.'s Mot. to Abstain) at 3:4-7; see also Baker Decl. Exs. 14-16 (Trademark Assignment Abstracts of Title)).

Rectorseal asserts that its subsidiary, Cargo Chemical Corporation, has acquired BMI and its assets. (Boyd Decl. Ex. C (Rectorseal's Letter to BMPI dated February 23, 2004)). Because of this acquisition, Rectorseal claims to have succeeded to BMI's rights and obligations under the Settlement Agreement and asserts that Boyd Flotation is BMPI's successor or assign under the agreement. (See id.). Rectorseal sent Boyd Flotation a letter explaining its position on February 23, 2004. (Id.).

In June 2004, Boyd Flotation filed an action in the Circuit Court for St. Louis County in the State of Missouri seeking a declaration that it was not bound by the terms of the Settlement Agreement. (See DRJN Ex. M (Pet. for Declaratory Relief)). On July 9, 2004, Rectorseal's counsel sent Boyd Flotation's president a letter purporting to give notice to Boyd

---

[3] At one time, Boyd Flotation erroneously presumed to have acquired rights to BMI's '685 trademark, as well, but has since relinquished any claim to that trademark. (See Baker Decl. Ex. 11 (Letter from Boyd Flotation's counsel)(apologizing for an oversight in attempting to register the '685 trademark); Def.'s Opp. to Pl.'s Mot. To Enforce Settlement Agreement at 2 ("Boyd Flotation does not purport to be the owner of this [the '685] trademark.")). Because the rights to the '685 trademark are undisputed, the court need not reach any arguments regarding that trademark.

6

Flotation that it was in violation of the Settlement Agreement. (<u>See</u> Pl.'s Mot. to Reopen, Ex. 5 (Letter dated July 9, 2004)). On or about September 14, 2004, Rectorseal filed a motion to reopen the case with this court. (<u>See</u> Pl.'s Mot. to Reopen). Thereafter, Boyd Flotation's declaratory relief action was removed to the United States District Court for the Eastern District of Missouri, and transferred to this court by the parties' stipulation. (<u>See</u> DRJN Ex. O (Mot. to Transfer from United States District Court Eastern District of Missouri)). The action was assigned case No. 04-2398. On November 22, 2004, this court entered a Related Case Order finding that Rectorseal's motion to reopen and Boyd Flotation's declaratory relief action raise substantially the same issues. (November 22, 2004 Order).

On or about December 3, 2004, both parties stipulated that Rectorseal's motion to reopen be treated as a motion to enforce the settlement agreement in case No. 00-1155 and that Rectorseal is not seeking to reopen the litigation or to vacate the court's May 14, 2002 stipulated dismissal order.[4] Rectorseal argues that Boyd Flotation is in violation of Paragraphs 2.A and 2.C[5] of the Settlement Agreement and seeks an order (1) enjoining

---

[4] The court will continue to cite this motion as "Plaintiff's Motion to Reopen" as it was originally captioned, with the understanding that it is construed as a motion to enforce the Settlement Agreement.

[5] Rectorseal also argues that Boyd Flotation is in violation of Paragraphs 4, 11, 15, and 17 of the Settlement Agreement. However, these "violations" are more accurately characterized as disputes about the applicability and/or validity of the Settlement Agreement as opposed to violations of it, and Rectorseal is not seeking relief for these "violations," other than attorney's fees, expenses, and costs incurred in resolving them. Therefore, the court will not address these "violations"

7

Boyd Flotation from using the BLUE MAGIC trademark except as provided in the Settlement Agreement; (2) requiring Boyd Flotation to take down its current website displaying the BLUE MAGIC trademark in a manner prohibited by the terms of the Settlement Agreement; and (3) compelling Boyd Flotation to pay Rectorseal its reasonable attorney's fees, expenses and costs incurred in this matter pursuant to paragraph 16 of the Settlement Agreement.

## II. Discussion

### A. Jurisdiction

A district court is authorized to enforce a settlement agreement that led to a dismissal where it retains jurisdiction over the settlement agreement in its dismissal order with the parties' consent. Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 381-382 (1994). Because the court explicitly retained jurisdiction over the matter in its dismissal order with the parties' consent, the court has jurisdiction to enforce the settlement agreement. (See May 14, 2002 Order; Pl.'s Mot. to Reopen, Ex. 1 (Settlement Agreement) ¶¶ 7, 15).[6]

### B. Merits

By its terms, the Settlement Agreement is enforceable against "the [p]arties and their . . . successors and assigns." (Pl.'s Mot. to Reopen, Ex. 1 (Settlement Agreement) ¶ 15). Neither Rectorseal nor Boyd Flotation were parties to the

---

in this order.

[6] The Settlement Agreement provides that certain notice procedures must be followed before invoking the court's jurisdiction. (See id, Ex. 1 ¶ 6). There is no dispute that these procedures were followed.

8

1  Settlement Agreement.  Rectorseal, however, claims to have
2  succeeded to BMI's rights and obligations under the Settlement
3  Agreement.  ((Boyd Decl. Ex. C (Rectorseal's Letter to BMPI dated
4  February 23, 2004)).  Boyd Flotation does not dispute that
5  succession or that Rectorseal is bound by the Settlement
6  Agreement.  Boyd Flotation simply denies that it is itself bound
7  by the Settlement Agreement.  Rectorseal argues, to the contrary,
8  that Boyd Flotation is also bound by the Settlement Agreement as
9  BMPI's successor or assign.

10        Under California law, a person or entity may transfer
11 its property or contract rights to another by assignment.  McGown
12 v. Spencer, 8 Cal. App. 3d 216, 219 (1970)("To assign ordinarily
13 means to transfer title or ownership of property."); Farmland
14 Irr. Co. v. Dopplmaier, 48 Cal. 2d 208, 222 (1957)(California
15 statutes "clearly manifest a policy in favor of free
16 transferability of all types of property, including rights under
17 contracts.").  The recipient of the assignment is deemed the
18 assignee.  See, e.g., Farmland Irr. Co., 48 Cal. 2d at 214(using
19 this terminology).

20        Boyd Flotation acquired its rights in the '014, '169
21 and '253 trademarks from LINC.  (See Boyd Decl., Ex. A (Purchase
22 Agreement dated August 28, 2003); DRJN, Ex. N ("Def.'s Mot. to
23 Abstain") at 3:3-7).  LINC sold Boyd Flotation its interest in
24 the trademarks after foreclosing on the secured interest in them
25 that it purchased from Wells Fargo.  (DRJN, Ex. N (Def.'s Mot. to
26 Abstain) at 3:4-7).  Wells Fargo had acquired a secured interest
27 in the trademarks from BMPI in 1995 - roughly seven years before
28 BMPI and BMI entered into the Settlement Agreement.  (See Boyd

Decl. Ex. B (Continuing Security Agreement); Pl.'s Mot. to Reopen, Ex. 1 (Settlement Agreement)).

The question is whether this chain of ownership makes Boyd Flotation an assign[ee] of BMPI.[7]  Under California law, a "'[s]ecurity interest' means an interest in personal property or fixtures that secures payment or performance of an obligation." Cal. Com. Code § 1201(36)(a).  A security interest is not an assignment.  See In re Cybernetic Serv., Inc., 239 B.R. 917, 923 (9th Cir. 1999)(security interest under Cal. Com. Code § 1201(36)(a) did not constitute an assignment under the Patent Act).  Rather, it is a mere agreement to assign in the event of a default by the debtor.  In re Roman Cleanser Co., 43 B.R. 940, 944 (Bankr. E.D. Mich. 1984); See also Cal. Com. Code § 9601(a)(1)(secured party may foreclose or otherwise enforce the security interest only after default).  Therefore, the security interest BMPI assigned to Wells Fargo, which Wells Fargo later assigned to LINC, did not constitute an assignment of BMPI's rights in trademarks '014, '169, and '253.  It was merely the transfer of a right to foreclose on those trademarks in order to secure payment on a debt.  See Cal. Com. Code § 1201(36)(a).

However, in the process of BMPI's bankruptcy, LINC foreclosed on its security interest in the '014, '169, and '253 trademarks, and the Trustee of BMPI's bankruptcy estate <u>assigned</u> LINC BMPI's ownership interest in the trademarks.  (See Baker Decl. Exs. 14-16 (Trademark Assignment Abstracts of Title)).

---

[7]  Note that "assign" is an archaic term for an "assignee."  See Webster's Third New International Dictionary 132 (1976).

10

1 Thereafter, LINC <u>assigned</u> that ownership interest to Boyd
2 Flotation.  (<u>Id.</u>).  It is well established that "the assignee
3 'stands in the shoes of the assignor.'"  <u>See</u>, <u>e.g.</u>, <u>General Motors</u>
4 <u>Acceptance Corp. v. Kyle</u>, 54 Cal. 2d 101, 114 (1960).  Because
5 Boyd Flotation is LINC's asignee, it stands in the shoes of LINC.
6 This means that Boyd Flotation cannot seek to claim a greater
7 interest in the '014, '169, and '253 trademarks than LINC
8 possessed.  Nor can Boyd Flotation escape the contractual
9 obligations imposed on its assignor.  <u>Cal. Packing Corp. v. Sun-</u>
10 <u>Maid Raisin Growers of Cal.</u>, 81 F.2d 674, 677 (9th Cir. 1936)
11 ("The ordinary rules of construction apply to assignments and
12 contracts affecting trade-mark rights.  Successors or assignees
13 are entitled to the same rights as the original proprietor, and
14 the assignee of a trade-mark is subject to the same defenses that
15 could be asserted against the assignor.").  Whatever rights and
16 obligations LINC had with respect to the '014, '169, and '253
17 trademarks have been transferred to Boyd Flotation, who now
18 stands in the shoes of LINC, as BMPI's assignee.

19          LINC acquired its ownership rights to the '014, '169,
20 and '253 trademarks, as distinguished from a mere security
21 interest in them, in August of 2003, over a year after the
22 Settlement Agreement limited the use of those trademarks.  BMPI's
23 bankruptcy trustee could not assign LINC any greater interest in
24 the trademarks than BMPI had after the Settlement Agreement.
25 <u>See, e.g.</u>, <u>In re Rigden</u>, 795 F.2d 727, 732 (9th Cir. 1986)("[T]he
26 only title that a [bankruptcy] trustee can sell is the trustee's
27 own right, title, and interest in the property.")(citing <u>Hagan v.</u>
28 <u>Gardner</u>, 283 F.2d 643, (9th Cir. 1960)).  Therefore, LINC's

11

1 ownership interest in the trademarks, which later became Boyd
2 Flotation's ownership interest in them, was subject to the
3 limitations existing after the Settlement Agreement.  Assuming
4 the Settlement Agreement is valid, any limitations it imposed on
5 the use of the trademarks would thus inure to Boyd Flotation.

6 Boyd Flotation, however, argues that BMPI lacked the
7 authority to transfer any of its rights in the trademarks to BMI
8 during the Settlement Agreement, as Boyd Flotation claims BMPI
9 attempted to do, because BMPI had previously contracted in a
10 security agreement "not to sell, hypothecate, or otherwise
11 dispose of, nor permit the transfer by operation of law of . . .
12 any of [its] interest [in the trademarks], except sales of
13 inventory to buyers in the ordinary course of [its] business."
14 (Boyd Decl. Ex. B (Continuing Security Agreement) ¶ 6(b)(v)).  In
15 response, Rectorseal argues that BPMI never transferred any
16 rights in its trademarks to BMI through the Settlement Agreement
17 but merely recognized the preexisting nature of those rights as
18 between the two signatory companies.

19 Nowhere in the Settlement Agreement can there be found
20 any reference to a sale, hypothecation, disposal, or transfer of
21 BMPI's interests in the trademarks.  At most, the Settlement
22 Agreement contains an arrangement whereby BMI agreed to pay BMPI
23 1% of its net sales on its vinyl, fabric and leather cleaners,
24 and protectants for a two-year period.  (Pl.'s Mot. To Reopen,
25 Ex. 1 (Settlement Agreement) ¶ 1.C).  This financial arrangement
26 falls under the "Payment" heading in the Settlement Agreement and
27 is not characterized, in any way, as a sale, hypothecation,
28 disposal, or transfer of any of BMPI's trademark rights.  (Id.).

1  Rather, the Settlement Agreement focuses on delineating the
2  respective industries to which BMPI and BMI agreed to market
3  their products.  (See id. ¶ 2).  Therefore, the Settlement
4  Agreement did not transfer any rights in the trademarks in
5  violation of BMPI's security agreement.
6         More importantly, however, even if the Settlement
7  Agreement could be read to transfer BMPI's rights in the
8  trademarks, the nontransferability clause within the Continuing
9  Security Agreement would not void the subsequent transfer by BMPI
10 to BMI of any rights BMPI had in the trademarks at the time of
11 the Settlement Agreement.  See Cal. Com. Code § 9401(b)("An
12 agreement between the debtor and the secured party which
13 prohibits a transfer of the debtor's rights in collateral or
14 makes the transfer a default does not prevent the transfer from
15 taking effect.").  Therefore, any transfer of rights that
16 occurred through the Settlement Agreement was valid, and any
17 interest in the '014, '169, and '253 trademarks Boyd Flotation
18 acquired from LINC was subject to the terms of the Settlement
19 Agreement.  Thus, Rectorseal may enforce the Settlement Agreement
20 against Boyd Flotation.
21        The Settlement Agreement specifically forbids BMPI and
22 its assigns from using "the Mark 'BLUE MAGIC' in any form or
23 combination on any product it markets or sells or may market or
24 sell that relates or pertains to the automotive industry,"
25 including any products marketed on a website.  (See Pl.'s Mot. to
26 Reopen, Ex. 1 (Settlement Agreement) ¶¶ 2.A-C, 15).  Rectorseal
27 has submitted evidence in the form of a printout dated March 26,
28 2004 of a posting on a website (http://www.bluemagic.com/

13

automarine.html) demonstrating that Boyd Flotation, as BMPI's assignee, is using the "BLUE MAGIC" mark to market products to the automotive industry.  (See Baker Decl. Ex. 10 (Attachments to Letter to Boyd Flotation's Counsel Dated April 8, 2004)).[8] Rectorseal now seeks an order requiring Boyd Flotation to take down that website and any current website displaying the BLUE MAGIC trademark in a manner prohibited by the Settlement Agreement.  However, the terms of the Settlement Agreement would allow Boyd Flotation to simply modify the website to conform with the Settlement Agreement without taking it down.  Therefore, the court will leave this decision to Boyd Flotation's discretion.

### C.  Attorney's Fees, Expenses, and Costs

Rectorseal seeks to recover its reasonable attorney's fees, expenses and costs incurred in these cases.  Paragraph 16 of the Settlement Agreement provides:

> [T]hat in the event litigation . . . is brought concerning the interpretation or enforcement of this Agreement, or because of an alleged dispute . . . or breach in connection with any of the provisions of this Agreement, the successful or prevailing [p]arty shall be entitled to recover reasonable attorney's fees, expenses and costs actually incurred in connection therewith, in addition to any other relief to which it may be entitled.

(Pl.'s Mot. to Reopen Ex. 1 (Settlement Agreement)).  Boyd Flotation's violation of the Settlement Agreement and dispute regarding its applicability compelled Rectorseal to file a motion to enforce the Settlement Agreement against Boyd Flotation and to oppose Boyd Flotation's request for declaratory relief.  Because

---

[8] The BMPI website had not changed as of April 20, 2005. See http://www.bluemagic.com/automarine.html(last visited on Apr. 20, 2005).  Nor does Boyd Flotation deny responsibility for the website.

14

Rectorseal has prevailed on both matters, it may recover its reasonable attorney's fees, expenses and costs actually incurred in connection with both matters.  Rectorseal must first, however, file a postjudgment motion for attorney's fees and a separate bill of costs with this court in compliance with Local Rules 54-292 and 54-293.

IT IS THEREFORE ORDERED that:

(1) Rectorseal's motion to enforce the Settlement Agreement against Boyd Flotation in case No. 00-1155 be, and the same hereby is, GRANTED;

(2) Boyd Flotation's motion for declaratory relief in case No. 04-2398 be, and the same hereby is, DENIED;

(3) Boyd Flotation be, and it hereby is, enjoined from using the BLUE MAGIC trademark except as provided in the Settlement Agreement;

(4) Boyd Flotation shall either take down any current website displaying the BLUE MAGIC trademark in a manner prohibited by the Settlement Agreement or modify such website to make it conform with the Settlement Agreement; and

(5) Rectorseal may recover its reasonable attorney's fees, expenses and costs incurred in cases No. 00-1155 and 04-2398 by proper motion pursuant to Local Rules 54-292 and 54-293.

DATED: May 13, 2005

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE